UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRA ENGINEERING & CONSTRUCTION CORP.,
NATIONAL FIRE ISNURANCE COMPANY AS
SUCCESSOR BY MERGER TO TRANSCONTINENTAL
INSURANCE COMPANY and TRANSPORTATION INSURANCE
COMPANY,

        Plaintiffs,

        v.                        Case No. 03-C-582

CAMP DRESSER & MCKEE, INC.,

        Defendant and Third-Party Plaintiff,

        v.

NICKELS & BRADLEY, S.C. and
CERTAIN UNDERWRITERS AT LLOYDS
OF LONDON,

        Third-Party Defendants.

**DECISION AND ORDER ON DEFENDANT
CAMP DRESSER & MCKEE, INC.'S MOTION TO
DISMISS CLAIMS AND EXCLUDE EVIDENCE**

## I.    BACKGROUND

Defendant Camp Dresser & McKee, Inc. ("CDM") has filed a motion seeking to dismiss certain claims from this action and to exclude certain expert testimony. The defendant's motion is now fully briefed and is ready for resolution.

CDM has labeled its motion as a motion for dismissal. Presumably, CDM is seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), which rule allows a defendant to seek dismissal on the basis of a plaintiff's failure "to state a claim upon which relief can be granted." But the Rule also provides that, in the event that matters outside the pleadings are presented to and not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent

to such a motion by Rule 56." Because the parties' submissions as they relate to the instant motion present material outside of the pleadings, the court will construe the defendant's motion as a motion for summary judgment.

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 630 (7th Cir. 2009). To state it differently, a party will be successful in opposing summary judgment only when they "present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) (citing *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002)).

2

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)). The evidence must create more than "some metaphysical doubt as to the material facts." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II.   FACTS

The subject matter of this lawsuit is a project known as the "North Avenue Dam" project ("Project"). (CDM's Proposed Findings of Fact ("DPFOF") ¶ 6.) The Project included the partial removal of the North Avenue Dam on the Milwaukee River in Milwaukee, Wisconsin. (DPFOF ¶ 6.) The Project further included the excavation and grading of the river bed and banks and placement of an articulated concrete matting revetment system ("ACM"), riprap and vegetation to stabilize the river bed and banks and to contain contaminated sediments between the dam and the area immediately north of the North Avenue Bridge. (DPFOF ¶ 6.) The Project also included the placement of limited

amounts of ACM, riprap and vegetation to stabilize areas of river bank between the North Avenue Bridge and the Locust Street Bridge. (DPFOF ¶ 6.)

Plaintiff Terra Engineering and Construction Corp. ("Terra") is a Wisconsin corporation in the business of, among other things, construction contracting. (DPFOF ¶ 1.) Plaintiffs National Fire Insurance Company as Successor by Merger to Transcontinental Insurance Company and Transportation Insurance Company (collectively "CNA") are foreign insurance companies authorized to conduct business in Wisconsin. (DPFOF ¶ 2.) CNA provided policies of general liability insurance to Terra with respect to the subject matter of this lawsuit and claims an interest by virtue of subrogation to Terra. (DPFOF ¶ 2.) Defendant and Third Party-Plaintiff CDM is a foreign corporation registered to conduct business in Wisconsin and is in the business of, among other things, providing engineering design services. (DPFOF ¶ 3.) Third-Party Defendant Nickels & Bradley, S.C. ("N&B"), is a Wisconsin service corporation and is in the business of, among other things, providing engineering services. (DPFOF ¶ 4.) Third-Party Defendant Certain Underwriters at Lloyds of London is an insurance entity that provided a policy of professional liability insurance to N&B covering the services provided with respect to the subject matter of this lawsuit. (DPFOF ¶ 5.)

In November 1996, the City of Milwaukee ("City") and CDM entered into a contract, under which, among other things, CDM agreed to prepare the design and construction documents for the Project. (DPFOF ¶ 7.) In 1997, CDM completed preparation of the construction contract documents, including plans and specifications for the Project, subject to the City's review and approval. (DPFOF ¶ 8.) CDM included in the construction contract documents a "performance specification" that identified design performance criteria for the ACM and required the contractor to submit design calculations stamped by a professional engineer and a placement plan that would meet those criteria. (DPFOF ¶ 9.) CDM's performance specification included in its design criteria a requirement that the

ACM be capable of resisting river forces from a 100-year storm event and up to 25-feet-per-second river velocity. (DPFOF ¶ 9.)

Terra submitted a bid for construction of the Project. (DPFOF ¶ 10.) In submitting its bid, Terra represented that it had reviewed the contract documents—designed by CDM—and that Terra had visited and become familiar with the site, all applicable laws and "carefully correlate[d] observations with the requirements of the contract documents." (DPFOF ¶ 10.)

Terra's bid for construction on the Project was ultimately accepted. (DPFOF ¶ 11.) On June 23, 1997, Terra entered into a construction contract with the City to build the Project. (DPFOF ¶ 11.)

On June 30, 1997, Terra submitted a request for substitution of an ACM product manufactured by Conlock for the specified ACM product manufactured by Armorflex. (DPFOF ¶ 12.) On September 9, 1997, Terra submitted design calculations—sealed by N&B— for the Conlock ACM. (DPFOF ¶ 13.) On September 22, 1997, Terra submitted revised design calculations for the Conlock ACM sealed by N&B. (DPFOF ¶ 15.) On September 25, 1997, CDM and the City rejected the Terra ACM submittal because it was based on inaccurate dimensions for the ACM placement area. (DPFOF ¶ 14.)

From July 1997 to July 23, 1998, Terra performed construction work on the Project. (DPFOF ¶ 16.) During this time, CDM performed limited construction phase services for the City that included review of shop drawings and periodic visits to the Project to observe the work. (DPFOF ¶ 17.)

In May 1998, the City observed that there were undulations in certain areas of the ACM. (DPFOF ¶ 18.) On June 8, 1998, the City notified Terra and CDM of problems with the ACM. (DPFOF ¶ 19.) In August 1998, after a significant storm event, the City observed that there were areas of the Project where riprap had become dislodged and areas where the ACM had become undulated, become dislodged or had broken off. (DPFOF ¶ 21.) After the storm event, the City, CDM and Terra

5

met and communicated to develop a plan to repair the damaged areas of the ACM. CDM agreed to collaborate and participate in the design of a repair.[1] (DPFOF ¶ 22.)

On March 3, 1999, the City notified CDM that its design was a possible cause of the problems encountered at the Project. (DPFOF ¶ 20.)

On January 5, 2000, CDM completed its design services relating to the repairs. (DPFOF ¶ 23.) At least until March 21, 2000, CDM continued to work with the City on issues concerning remedial measures to repair the ACM. (CNA's Response to CDM's Proposed Findings of Fact ¶ 23.) Terra performed its repair work on the Project during the spring of 2000. (DPFOF ¶ 24.) CNA states that it paid Terra approximately $781,0000 for this repair work. (DPFOF ¶ 25.) The City did not accept the repair work as satisfying the requirements of Terra's contract and has not paid Terra its final retainage. (DPFOF ¶ 26.)

On April 25, 2003, Terra and CNA initiated this action against CDM in the Milwaukee County Circuit Court. (DPFOF ¶ 27.) In their complaint, Terra and CNA alleged that CDM was negligent in the initial design of the Project and in the design of the repairs that were implemented. (DPFOF ¶ 27.) On June 19, 2003, CDM removed the action to federal court. (DPFOF ¶ 28.) On April 28, 2004, CDM filed a Third-Party Complaint against N&B. (DPFOF ¶ 29.)

On February 6, 2006, the City filed an action against Terra, CNA and CDM alleging breaches of contract and warranty by Terra and CNA relating to the construction of the project and breach of contract by CDM relating to the design of the project. (DPFOF ¶ 30.) In their defense against the City, defendants Terra, CNA and CDM pled the statute of limitations. (DPFOF ¶ 30.)

---

[1] The parties appear to dispute whether CDM had a contractual relationship to work on the repair design of the ACM. Both parties point to CDM's contract with the City in support of their positions. Additionally, CNA has submitted letters from the City to CDM that generally refer to the existence of a warranty. But neither party directs the court's attention to a specific provision within the contract or its numerous attachments that outline CDM's obligation or lack thereof to repair the ACM. As a result, the court will proceed by assuming that the parties dispute whether CDM's contract with the City obligated the company to design any repairs for the ACM.

On January 22, 2008, CNA and the City entered into a settlement agreement that included the assignment of the City's claims against CDM to CNA. (DPFOF ¶ 31.) On April 11, 2008, the parties to the City's lawsuit agreed to the dismissal of claims against CNA, Terra and CDM. (DPFOF ¶ 32.)

### III. ANALYSIS

CDM's motion addresses three of CNA's claims against CDM: (1) a breach of contract claim assigned from the City to CNA; (2) a negligence claim assigned from the City to CNA; and (3) a direct negligence claim asserted by CNA against CDM. As will be discussed below, CNA's second amended complaint generally asserts negligence claims against CDM without differentiating whether each allegation of negligence flows from CNA's direct negligence claim or the negligence claim assigned to CNA from the City. Nevertheless, CDM's motion seeks an order: (1) dismissing the plaintiffs' negligence and breach of contract claims against CDM based on the alleged assignment by the City of Milwaukee; (2) dismissing the plaintiffs' claims against CDM to the extent that they relate to CDM's performance of construction phase services; (3) excluding evidence of or recovery of any past, present or future damages of the City of Milwaukee; (4) excluding the expert testimony and opinion evidence of plaintiffs' designated expert witnesses, Kim Anderson and Robert Palermo; and (5) dismissing CNA's direct negligence claim against CDM based on the exclusion of CNA's expert testimony. The defendant's motion is now fully briefed and is ready for resolution. For the reasons that follow, the defendant's motion will be granted in part and denied in part.

### A. Assigned Contract Claim

CDM asserts that dismissal of CNA's breach of contract claim that was assigned from the City is necessary because CNA's assigned breach of contract claim is time-barred. (CDM's Br. at 5.) CDM contends that, because a breach of contract action must be commenced within six years after the cause of action accrues in order to be timely, *see* Wis. Stat. § 893.43, CNA's assigned breach of

7

contract claim is time-barred. (CDM's Br. at 5.) Specifically, CDM points to three possible accrual dates for the City's breach of contact claim and asserts that all three occurred more than six years before the City filed suit.

CDM asserts that the following facts are undisputed: (1) CDM completed its design services by preparation of the contract bid documents and oversaw the Project bidding in 1997; (2) CDM provided construction management services in 1997 and 1998; (3) the City was aware of potential failures in the ACM in August 1998; (4) CDM completed its repair design activities in January 2000. (*Id.* at 5-6.) Given the foregoing, CDM contends that "[t]o the extent that the City had a breach of contract claim relating to repair design, that cause of action would have accrued no later than January 2000." (*Id.*)

CNA contends that dismissal of its assigned breach of contract claim is not appropriate because the claim arises are out of the same conduct, transaction or occurrence, i.e., the design and construction of an artificial riverbed in the Milwaukee River by CDM, Terra and Nickels & Bradley. (CNA's Br. at 4.) CNA further contends that CDM already raised this issue before this court two years ago and did not succeed. In the alternative, CNA contends that CDM continued to perform its "ongoing duties under the original contract into at least February of 2000," or within the six-year statute of limitations.

Turning to CNA's argument that this court has already decided the relation back issue, I am satisfied that this court's previous order did not address whether CNA could pursue assigned claims from the City without running afoul of the statutes of limitations. Rather, this court's February 1, 2007 Order allowed for the substitution of a named plaintiff.

The parties differ on the appropriate standard of review. CNA asserts that Fed. R. Civ. P. 15 allows for the City's claims assigned to CNA to proceed. Rule 15 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
>> (A) the law that provides the applicable statute of limitations allows relation back;
>> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out-- in the original pleading;

Fed. R. Civ. P. 15(c). CNA further asserts that, to the extent that Wisconsin law applies to the assigned claim, the same result is reached. Specifically, CNA points to the text of Wis. Stat. § 802.09, which states in pertinent part:

> If the claim asserted in the amended pleading arose out of the transaction, occurrence, or event set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the filing of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against such party, the party to be brought in by amendment has received such notice of the institution of the action that he or she will not be prejudiced in maintaining a defense on the merits, and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against such party.

Wis. Stat. § 802.09(3).

By contrast, CDM contends that, because the City was never a party to the lawsuit, the relation back standards of Fed. R. Civ. P. 15(c) and Wis. Stat. § 802.09 are not applicable. (CDM's Reply Br. at 2.) CDM reasons that, because the City "filed its lawsuit more than six years after the action accrued," the City did not have any valid claims to assign to CNA. (*Id.*)

In my opinion, the issue for this court to resolve is whether the City had a valid breach of contract claim when it assigned its claims to CNA. CDM is correct that the general rule is that an assignee of a contract acquires no greater rights by reason of the assignment than were possessed by

the assigner. *See FPL Energy Point Beach, LLC v. Energy Res. of Austl. Ltd.*, 565 F. Supp. 2d 999, 1007 (W.D. Wis. July 17, 2008). Accordingly, the court must determine whether the City had a valid breach of contract claim on February 6, 2006, when the City filed its suit in Milwaukee County Circuit Court.

In contrast to CDM's characterization of its contract with the City, CNA states that CDM's original contract with the City included a two-year warranty and that CDM undertook repairs to the ACM as part of its obligation to the City under the warranty. (CNA's Br. at 8-9.) CNA states that, as of February 15, 2000, CDM was still performing work for "on-going design and construction work . . . under its 1996 contract with the City." (*Id.*) Given the above, CNA contends that the City timely filed its claim against CNA or, in the alternative, that a question of fact exists as to when CDM's breach occurred.

In support of its argument that the City timely filed its suit against CDM, CNA contends that "[c]ontracts requiring continuing obligations may suffer multiple partial breaches, but are also capable of suffering a single total breach by material failure to perform." (CNA's Br. at 8.) CNA points to the Wisconsin Court of Appeals' opinion in *Segall v. Hurwitz*, 114 Wis. 2d 471, 491, 339 N.W.2d 333 (Wis. App. 1983), as support for its argument. In *Segall*, the plaintiff alleged that certain defendants violated their covenants not to compete from August 31, 1972 to August 21, 1977. *Id.* at 490. The circuit court had found that the plaintiff's claim was time-barred because the plaintiff knew of instances where the defendants had breached the contracts in early 1973, but did not file a complaint until May 23, 1979. *Id.* The court of appeals reversed the circuit court's decision on the timeliness of the plaintiff's breach of contract claim. *Id.* at 492. In reversing the circuit court, the court of appeals explained that the plaintiff may be able to recover for breaches of the continuous duty not to

compete that occurred within the limitations period. *Id.* at 491-92. CNA likens the covenant not to compete at issue in *Segall* to the contract currently before the court.

By contrast, CDM points to *State of Wisconsin v. Holland Plastics Co.*, 111 Wis. 2d 497, 331 N.W.2d 320 (1983). In *Holland Plastics*, the State sued the manufacturer, supplier and installers of roofing materials at a State university building. *Id.* at 500-01. In *Holland*, the court began its analysis by noting that a six-year statute of limitations applies to contract claims and that a cause of action accrues for such a claim when the breach occurs. *Id.* at 506. The court proceeded to consider and to reject the plaintiff's argument that "the breach could not have occurred until the building was substantially completed . . . because until that time there was no representation made that the building was without defect." *Id.* In support of this argument, the plaintiff had relied upon the Wisconsin Supreme Court's decision in *Krueger v. V.P. Christian Silo Co.*, 206 Wis. 460, 240 N.W. 145 (1932), wherein the court stated, in pertinent part, as follows:

> If the defendant failed to build the silo in a substantial and workman like manner as required by that contract, the breach occurred . . . when the defendant completed the erection of the silo. Plaintiff's cause of action arose at that time, and the statute of limitations commenced to run from that time even though plaintiff did not know of the breach.

*Id.* at 462. After considering the above the statement, the court in *Holland Plastics* noted that the Wisconsin Supreme Court had since reaffirmed that "it is the moment the breach occurs that is the time a cause of action in contract accrues." *Id.* at 506 (citing *Milwaukee County v. Schmidt, Garden & Erikson*, 43 Wis. 2d 445, 455, 168 N.W.2d 559 (1968)). The court further noted that the Wisconsin Supreme Court has stated that the language in *Krueger* suggesting that a cause of action for breach of contract accrues at the time of a project's completion was "taken out of context." *Holland Plastics*, 111 Wis. 2d at 506.

This court is satisfied that the City's cause of action had accrued by the time the City observed significant problems with the ACM in March 1999.[2]  The contract in this case generally called for CDM to prepare and oversee design work for the Project.  The contract did not call for CDM to maintain "a series of performances over a period of time," such as a contract to "maintain and keep in repair roads, fences, and buildings, to give a railway pass for life, to furnish heat, to refrain from competition in business, and to supply another for life with ice for his own use."  4 Corbin on Contracts, § 956 (1951).  To the extent that CNA attempts to extend the concept of continuing contracts to the construction project at issue in this case, the court's opinion in *Holland Plastics* that the date of breach and not the date of substantial completion marks the accrual of a breach of contract action forecloses this result.  *See Holland Plastics*, 111 Wis. 2d at 506.  The contract in this case does not appear to have been a  "continuing contract," as that term was used by the court in *Segall*.  And so, the plaintiffs' claim for breach of contract accrued when the breach occurred—in this case, at the latest, by the City's observations in March 1999 that the ACM was in need of repair.  Because the City did not file its suit until February 2006—more than six years after the breach occurred—the assigned breach of contract claim is barred by the applicable statute of limitations.   Thus, CDM's motion to dismiss the plaintiffs' breach of contract claim that was assigned from the City will be granted.

**B.**    **Assigned Negligence Claim**

CDM contends that CNA's negligence claim that was assigned from the City is time-barred because the claims were brought more than six years after discovery.  (CDM's Br. at 6.)  CDM contends that "the City discovered its injury no later than August 5, 1998, and more likely in May 1998."  (*Id.* at 7.)  Given the foregoing, CDM contends that "CNA brought the assigned negligence

---

[2]    As the court understands CDM's motion, CDM is attempting to dismiss CNA's assigned breach of contract claim against CDM.  Because the parties have not addressed whether any assigned breach of warranty claim would run afoul of the statute of limitations, the court does not have occasion to consider such issue.

12

cause of action more than six years after accrual; and the claim must be dismissed under the applicable statute of limitations." (*Id.*)

In response to the above, CNA contends that "CDM does not contest that the statute of limitations for tort claims against it has not yet expired." (CNA's Br. at 7.) CNA also asserts that "tort claims are subject to a discovery rule, and tort statutes of limitations generally run from the date of a tort victim's injury is discovered." (*Id.*)

A negligence claim based on either property damage or injury to the character or rights of another must be commenced within six years of accrual or is barred. Wis. Stat. § 893.53. "[U]nder Wisconsin law, a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct or product." *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140, 146 (1986).

First off, I am satisfied that CDM asserted in the motion currently before the court as well as in its brief that the assigned negligence claims from the City to CNA are barred by the statute of limitations. Additionally, CDM asserted that to the extent that CNA's second amended complaint asserts a direct "duty of care" negligence claim against CDM such claim is barred by the statute of limitations. The court will therefore turn to the merits of CDM's arguments.

In this case, I find myself in agreement with CDM's contention that CNA's assigned negligence claim, to the extent that it concerns any work performed prior to March 3, 1999, is barred by the statute of limitations. Again, on March 3, 1999, the City notified CDM and Terra of alleged project deficiencies as well as the City's belief that CDM's design caused such deficiencies. (DPFOF ¶ 20.) In other words, on March 3, 1999, the nature of the City's injury and the potential role of CDM in causing that injury was apparent. As a result, the City's negligence claim, insofar as it concerns

work performed by CDM prior to March 3, 1999, became barred by the statute of limitations on March 3, 2005—i.e., prior to the filing of the City's suit. Given the applicable six-year statute of limitations, CNA's assigned negligence claim as it pertains to work performed by CDM prior to March 3, 1999, was time-barred by the time the City filed its suit in February 2006.

However, I do not agree with CDM's contention that CNA's assigned negligence claim, to the extent it relates to any of the repair work conducted after March 3, 1999 through March 2000, is time-barred. Quite frankly, the facts submitted by the parties do not reveal a great deal about what occurred on the Project between March 3, 1999 through the completion of the repair work sometime in March 2000.[3] Again, CDM was in some way involved with the repairs to the ACM at least through approximately March of 2000. But CDM has not presented any argument that the City knew or somehow should have known of any negligence in the repair work performed on the Project after March 3, 1999 but before February 2000—i.e., outside of the statute of limitation's six-year requirement. Even if the court were to assume that the City should have known of any negligence in the repair work commenced after the City's March 3, 1999 letter immediately upon the contemplated repair work's completion, which appears to have been in March 2000, the City's suit, which was filed in February 2006, would still fall within the six-year statute of limitations.

Additionally, to the extent that CDM contends that CNA's assigned negligence claim does not relate back to the City's original complaint, I am not so persuaded. "The basic test for whether an amendment should be deemed to relate back is the identity of transaction test, i.e., did the claim or defense asserted in the amended pleadings arise out of the same transaction occurrence or event set forth in the pleading." *Korkow v. General Cas. Co. of Wisconsin*, 117 Wis. 2d 187, 196, 344 N.W.2d

---

[3] The plaintiffs state in the second amended complaint that "[o]n or about November 21, 2001, the City advised Terra and CDM of additional problems with the Milwaukee River Project. Specifically, the original articulated concrete mat and block continued to fail, and the repairs that were performed in 2000 had begun to fail." (Second Amended Complaint ¶ 26.)

108 (Wis. 1984). The City's suit against CDM, CNA, and Terra clearly addressed issues concerning the design and repair of the ACM. As a result, I am satisfied that at least part of CNA's assigned negligence claim—to wit, the negligence claim concerning CDM's work on the Project after March 3, 1999—relates back to the City's complaint in its suit against CDM, CNA, and Terra. Given the foregoing, CDM's motion to dismiss CNA's assigned negligence claim, as it pertains to the work performed on the Project after March 3, 1999, will be denied.

**C.    Duty of Care**

CDM's next argument for dismissal deals with CNA's assertion in its second amended complaint that CDM was negligent in its initial design and repair-design work. As noted above, CNA's second amended complaint does not differentiate whether the allegation at issue in CDM's motion stems from CNA's direct negligence claim against CDM or CNA's negligence claim assigned from the City. More precisely, CNA alleges for the first time in its second amended complaint as follows:

> Upon information and belief, CDM also breached its professional duties by, among other things, failing to properly inspect work as it proceeded, approving materials that failed to meet professional architectural design criteria and approving plans and work which did not meet the professional architectural design criteria.

(Second Amended Complaint ¶ 37.) The court notes that CNA has set forth other instances in the second amended complaint where CDM allegedly failed to abide by the required duty of care. But, it appears that CDM's motion for dismissal of CNA's "duty of care" claim is really seeking the dismissal of CNA's negligence claim against CDM as it pertains to CDM's work performed during the construction phase of the Project.

In support of its motion to dismiss this claim, CDM contends that it is being criticized by CNA for not catching Terra's errors. CDM states that "[a]s subrogated insurer to Terra, CNA's rights and opportunity to recover damages are limited by Terra's failure of performance." (CDM's Br. at 7.) But

CDM does not really develop this argument. To be sure, CDM has offered some authority for its assertion that CNA cannot recover any damages in excess of Terra's damages, but it has not offered any citations or argument to support its conclusion that CNA should therefore not recover any damages. As a result, the court is not persuaded by CDM's argument on this issue.

In the alternative, CDM contends that "Terra's contract with the City specifically provides that its duty to perform is not limited or excused by the City or its agents not catching or rejecting Terra's 'substandard or inferior work or materials.'" (*Id.* (citing Exhibit 1.) Here again, CDM has not offered—and this court has not found—any reasoning to support CDM's argument that the specified contractual provision in Terra's contract with the City requires dismissal of Terra's negligence claim against CDM.

As for CDM's argument that it "did not owe construction phase duties to Terra" (CDM's Br. at 8), this is beside the point in a negligence claim. *See Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶¶ 30, 291 Wis. 2d 283, 306, 717 N.W.2d 17, 29 ("If a person, without intending to do harm, act, or fails to do an act, that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property, he or she is not exercising ordinary care under the circumstances, and is therefore negligent."). As a result, the court does not agree with CDM, based on the arguments in CDM's briefs, that CNA does not possess a direct negligence claim against CDM based on CDM's alleged negligence during the construction phase of the project. This is not to say that CNA is attempting to assert a direct negligence claim with this allegation. Rather, the court is rejecting CDM's argument that CNA, as Terra's subrogated insurer, is prohibited from making such an allegation.

CDM concludes by arguing that because CNA's "duty of care" claim is assigned from the City, the claim is time-barred by the applicable statute of limitations. As noted above, the court is not

convinced that the "duty of care" allegation in CNA's second amended complaint stems from the negligence claim assigned from the City to CNA. In the event that CNA is asserting an assigned negligence claim from the City, the court has already addressed CDM's argument that the negligence claims assigned by the City to CNA were time-barred by the applicable statute of limitations. To the extent that CDM may be attempting to hedge its bets with its assertion that even a direct negligence claim by CNA against CDM would be time-barred, CDM again has not offered any reasoning in support of this argument. In sum, CDM's motion to dismiss based on CNA's allegation—either as part of CNA's direct negligence claim against CDM or the negligence claim assigned from the City to CNA—that CDM breached its duty of care will be denied.

**D.     Estoppel**

CNA contends that CDM's continued representations that its design for the ACM repair was adequate estop it from asserting a statute of limitations defense. (CNA's Br. at 10.) CNA asserts that "[u]nlike Terra and CNA, CDM refused to refund the repair project, on the theory that the type and size of ACM mat selected for the project was appropriate." (*Id.* at 10.) As a result, CNA asserts that the City and Terra were harmed by relying on CDM's representations about the initial designs for the Project and its ability to design repairs to the Project. (*Id.*) CNA argues that "Terra and the City of Milwaukee both filed suit within a reasonable time from the period it became apparent to each of them that CDM's claims regarding the adequacy of its work were unsustainable." (*Id.* at 11.) As a result, CNA asserts that application of the doctrine of equitable estoppel is appropriate in this instance.

Courts may estop a defendant from asserting a statute of limitations defense after considering the following six guideposts:

> (1) Is the defendant guilty of fraudulent or inequitable conduct? (2) Did plaintiff fail to timely commence the action because he or she relied on the defendant's conduct? (3) Did the defendant's questionable conduct occur before the statute of limitations expired? (4) Did the plaintiff diligently pursue the suit after the defendant's

questionable conduct ceased? (5) Did the plaintiff rely on the defendant's conduct to his or her disadvantage? and (6) The defendant need not have engaged in actual fraud.

*Williams v. Kaerek Builders, Inc.*, 212 Wis. 2d 150, 161 (Ct. App. 1997).

In my opinion, the application of equitable estoppel in this case is not appropriate. Turning to the first factor, CDM's conduct in denying that its design caused the problems with the ACM has not been shown to be inequitable or fraudulent—indeed, CDM maintains this defense as its legal theory before this court. With respect to the second factor, and as noted above, the City stated in March 1999 that it knew of problems with the ACM and that it believed one probable cause of such problems was CDM's design of the ACM. Thus, while the City and CDM did communicate regarding the repair of the ACM through March 2000, the City was well aware of its belief that the ACM was not properly designed well before the Project's completion and well before it filed suit in February 2006. And to the extent that the City may have relied on CDM's representations regarding the proper design of any repairs, such reliance does not explain a four- or five-year delay in filing suit. This ties in with an application of the third guidepost in that the events in question were spread over a four-year period that ended well before the statute of limitations expired. As to the fourth factor, neither the plaintiffs nor the City has explained the four-year delay between the completion of all repairs to the Project and the City's filing suit in February 2006. The final two guideposts, while weighing slightly in the City's favor, do not establish that application of equitable estoppel is appropriate. In particular, the City did rely on CDM to assist the City in completing repairs to the ACM. But, and as previously stated, the repairs to the ACM were completed years before the City filed suit and long after the City notified CDM that it believed CDM's designs were probably related to the problems with the ACM. In sum, CNA's argument that the CDM should be equitably estopped from asserting a statute of limitations defense is rejected.

**E.      Evidence Regarding City's Damages or Cost of Future Repairs**

CDM seeks to exclude evidence of any damages that have been or may be incurred by the City relating to the Project.  (CDM's Br. at 8.)  In support of this claim, CDM contends that CNA is seeking to recover, as an assignee of the City, all of the City's damages.  (*Id.*)  CDM contends that, because the assigned claims must be dismissed as time-barred, so too should any evidence on damages stemming from those claims.  (*See* CDM's Br. at 9.)  Because this court is allowing CNA to proceed on a negligence claim assigned from the City—to wit, the negligence claim stemming from CDM's repair work to the Project performed after March 3, 1999—CDM's motion to exclude evidence relating to the City's damages stemming from CDM's work on the Project after March 3, 1999, will be denied.  To the extent that CDM's motion seeks to exclude evidence of the City's damages stemming from CDM's work on the Project prior to and including March 3, 1999, CDM's motion will be granted.

**F.      Expert Testimony**

CDM seeks to exclude Dr. Kim Anderson's and Mr. Robert Palermo's expert testimony under Fed. R. Evid. 702.  CDM contends that the experts' testimony should be excluded because the experts' testimony is unreliable.   In three reports— dated January 22, 2003, December 15, 2005, and August 8, 2008—Dr. Anderson and Mr. Palermo set forth opinions that addressed the following: whether the work performed by Terra Engineering materially deviated from CDM's Project requirements; the apparent causes of some of the failures of the project; and potential remediation measures.

CDM seeks to exclude Dr. Anderson's testimony on these matters because Dr. Anderson's expert testimony is not based on his knowledge, skill, experience, training or education.  Similarly, CDM contends that Dr. Anderson's opinion is not informed by his expertise.  CDM also contends that "[Dr. Anderson's] testimony makes clear that any opinions he holds that are arguably relevant to

CNA's burden of proof are not independent opinions, but are derivative of the work and opinions of others." (CDM's Br. at 13.)

CDM seeks to exclude Mr. Palermo's expert testimony because his theory regarding the suitability of the ACM over highly compressible sediments has not gained general acceptance. CDM states that "Mr. Palermo's fundamental opinion, that an ACM system cannot be placed over highly compressible sediments, was not the product of reliable principles and methods." (CDM's Br. at 13.) CDM further states that Mr. Palermo has not offered any analysis or data that supports his opinions. (*Id.* at 16.)

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial judge is to exercise gate-keeping responsibility with respect to the admission of expert testimony and opinions, and thereby "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The court "must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. This determination involves "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93.

*Daubert* provides a list of four factors to be used in determining the soundness of the methodology:

> (1) whether the proffered conclusion lends itself to the verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence.

*Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996).

However, this list of four factors is non-exclusive and does not constitute a definitive checklist or test. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Rather, regardless of the specific factors used, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152. To be admissible, therefore, an expert opinion must rise above "subjective belief or unsupported speculation." *Target Market Publ'g, Inc. v. Advo, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998). In making this determination, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.

After reviewing the parties' briefs, the expert reports and relevant portions of the record, I am satisfied that the parties' experts should be allowed to testify in this case.

Turning first to Dr. Anderson, as I understand the crux of CDM's argument here, Dr. Anderson's experience on this project and many others does not relate to the issues involved in this litigation. But I do not see why Dr. Anderson may only be qualified to testify as an expert if he has worked as an engineering design professional or a geotechnical engineer. Rather, the issue is whether someone with Dr. Anderson's background is qualified to testify as an expert on whether the work performed by Terra materially deviated from CDM's Project requirements; the apparent causes of some of the failures; and potential remediation measures. Based on Dr. Anderson's resume and

considerable experience in the construction industry, I find that he possesses specialized knowledge that will assist the court in understanding the issues presented in this case.

Similarly with Mr. Palermo, I have reviewed the record and I find his testimony to be reliable. As an initial matter, Mr. Palermo's background and experience are not in question. Rather, CDM argues that Mr. Palermo's expert testimony is not reliable because "Mr. Palermo's fundamental opinion, that an ACM system cannot be placed over highly compressible sediments, was not the product of reliable principles and methods." (CDM's Br. at 13.) To the extent that Mr. Palermo's expert testimony extends beyond issues relating to the ACM, CDM does not appear to argue that his opinions are unreliable. In this instance, I find myself in agreement with CNA that Mr. Palermo's opinions, which are based on Mr. Palermo's review of field reports, contract documents, specifications, photographs, project drawings, manufacturer's installation instructions and on-site observations, are sufficiently reliable to justify their being heard by the court. This is not to say that CDM's motion does not raise serious questions about significant portions of Mr. Palermo's expert opinion. But CDM will have an opportunity to pursue these issues on cross-examination.

It bears mentioning that the parties in this case have elected to have a court trial. And so, the court will assign whatever weight it deems appropriate to the expert testimony in this case. Given the foregoing, as well as the reliability of CNA's expert testimony, CDM's motion to exclude such testimony will be denied.

Additionally, the court will deny CDM's motion to dismiss CNA's direct negligence claim against CDM. CDM's motion to dismiss CNA's negligence claim is conditioned on this court's exclusion of Dr. Anderson's and Mr. Palermo's expert testimony. Because the court is allowing both experts to testify, CDM's motion to dismiss CNA's remaining negligence claim will be denied as moot.

Finally, in its response brief, CNA states that "[i]f the plaintiffs' expert witnesses are precluded from testifying because their testimony purportedly does not satisfy the *Daubert* standard, then the defendant's expert witnesses should be precluded on the same basis." (CNA's Br. at 28-29.) The court's denial of CDM's motion to exclude renders moot CNA's request to exclude.

**NOW THEREFORE IT IS HEREBY ORDERED** that CDM's motion to dismiss plaintiffs' breach of contract claims against CDM based on the assignment from the City of Milwaukee be and hereby is **GRANTED;**

**IT IS FURTHER ORDERED** that CDM's motion to dismiss the plaintiffs' negligence claims against CDM based on the assignment from the City of Milwaukee be and hereby is **GRANTED IN PART** to the extent such claim concerns work CDM performed on the Project prior to and including March 3, 1999**,** and **DENIED IN PART** to the extent such claim concerns work CDM performed on the Project after March 3, 1999;

**IT IS FURTHER ORDERED** that CDM's motion to dismiss the plaintiffs' negligence claim against CDM to the extent that the claim relates to CDM's performance of construction phase services be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that CDM's motion to exclude evidence of or recovery of any past, present or future damages of the City of Milwaukee be and hereby is **GRANTED IN PART** to the extent that such damages stem from CDM's work on the Project prior to and including March 3, 1999, and **DENIED IN PART** to the extent that such damages stem from CDM's work on the Project after March 3, 1999;

**IT IS FURTHER ORDERED** that CDM's motion to exclude the expert testimony and opinion evidence of plaintiffs' designated expert witnesses, Kim Anderson and Robert Palermo, be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that CDM's motion to dismiss CNA's direct negligence claim be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that CNA's request to exclude expert testimony be and hereby is **DENIED AS MOOT**.

**SO ORDERED** this 21st day of July 2010 at Milwaukee, Wisconsin.

**BY THE COURT:**

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
